# Third District Court of Appeal

## State of Florida

Opinion filed August 24, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-2360
Agency Case No. 15F-5178
_____

**M.T.,**
Appellant,

vs.

**Agency for Persons with Disabilities,**
Appellee.

An Appeal from the Agency for Persons with Disabilities.

Stephanie Langer, for appellant.

Llamilys Bello (Fort Lauderdale), for appellee.

Before SALTER, EMAS and FERNANDEZ, JJ.

SALTER, J.

M.T., a young man diagnosed with Lennox-Gastaut syndrome[1] and afflicted with seizures that are continuous and non-responsive to any known medical

treatment, appeals a final order by Florida's Agency for Persons with Disabilities (APD) and a hearing officer denying M.T.'s mother's application (on M.T.'s behalf) for enrollment in APD's Home and Community-Based Services Waiver Program (the "HCBS Waiver Program").[2] We reverse.

Facts and Procedural History

[1] The National Institute of Neurological Disorders and Stroke (a part of the National Institutes of Health, in Bethesda, Maryland), describes the syndrome:

> Lennox-Gastaut syndrome is a severe form of epilepsy. Seizures usually begin before 4 years of age. Seizure types, which vary among patients, include tonic (stiffening of the body, upward deviation of the eyes, dilation of the pupils, and altered respiratory patterns), atonic (brief loss of muscle tone and consciousness, causing abrupt falls), atypical absence (staring spells), and myoclonic (sudden muscle jerks). There may be periods of frequent seizures mixed with brief, relatively seizure-free periods. Most children with Lennox-Gastaut syndrome experience some degree of impaired intellectual functioning or information processing, along with developmental delays, and behavioral disturbances. Lennox-Gastaut syndrome can be caused by brain malformations, perinatal asphyxia, severe head injury, central nervous system infection and inherited degenerative or metabolic conditions. In 30-35 percent of cases, no cause can be found.

http://www.ninds.nih.gov/disorders/lennoxgastautsyndrome/lennoxgastautsyndrome.htm (last visited Aug. 3, 2016).

The NINDS description also states that "There is no cure for the disorder." Id.

[2] Although M.T. is represented here by counsel, it is noteworthy that M.T.'s mother, pro se, presented M.T.'s evidence and arguments during the administrative hearing, and did so in a polite and effective way.

2

M.T.'s mother applied for participation in the HCBS Waiver Program under the "intellectual disability" statutory definition, section 393.063(21), Florida Statutes (2015):[3]

> "Intellectual disability" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior which manifests before the age of 18 and can reasonably be expected to continue indefinitely. For the purposes of this definition, the term:
>
> (a) "Adaptive behavior" means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.
>
> (b) "Significantly subaverage general intellectual functioning" means performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the agency.

The application was denied by APD in a written notice stating summarily that M.T. had been determined not to have an intellectual disability as defined in the statute. As provided by APD's rules and procedures, M.T.'s mother then sought and was granted an administrative hearing. M.T.'s mother and APD introduced testimony and written exhibits over the course of two days. In September 2015, the hearing officer issued a final order containing findings of fact, analysis, and a decision denying M.T.'s appeal. This further and timely appeal

---

[3] The definition was renumbered as section 393.063(24), effective June 30, 2016.

followed. We have jurisdiction pursuant to section 120.68, Florida Statutes (2015), and Florida Rule of Appellate Procedure 9.030(b)(1)(C).

Standard of Review

Although we review an administrative hearing officer's findings of fact to determine whether they are supported by competent, substantial evidence in the record before us, the hearing officer's conclusions of law are subject to de novo review. Diaz & Russell Corp. v. Dep't of Bus. & Prof'l Regulation, 140 So. 3d 662, 664 (Fla. 3d DCA 2014). While a state agency's interpretation of the laws it is charged with enforcing is entitled to great deference, that deference does not apply when the agency's interpretation is clearly erroneous. Verizon Fla., Inc. v. Jacobs, 810 So. 2d 906, 908 (Fla. 2002); S.C. v. Agency for Pers. with Disabilities, 159 So. 3d 1033, 1036 (Fla. 3d DCA 2015).

Analysis

An applicant who seeks benefits under the programs administered by APD bears the burden of establishing eligibility "by a preponderance of the evidence, to the satisfaction of the hearing officer." Fla. Admin. Code R. 65-2.060(1). The evidence admitted on behalf of M.T. established that: (a) at age 10, M.T. scored in the borderline range on a visual motor integration test, in the average range for visual-perception skills, and in the extremely low range for adaptive functioning; (b) when M.T. was 14, his Philadelphia physician reported (in writing) a diagnosis

4

of "Chronic Static Encephalopathy resulting in mental retardation;"[4] (c) at age 21, M.T. was assessed by the Miami-Dade County Public Schools and had an IQ score of 61; (d) four months later, M.T.'s Miami doctor tested him and M.T. scored an estimated IQ of 75;[5] M.T.'s cognitive decline, brain damage, and deficits in adaptive functioning had manifested themselves before he turned 18 years of age.

APD relied on its own notice of ineligibility, its "diagnostic and evaluation team screening committee form," and its argument that M.T. was ineligible because his mother had not provided an IQ test result as administered before M.T. turned 18 years of age. APD's only witness was an "operations management consultant" who served as chair of the APD eligibility committee on M.T.'s case. The consultant did not evaluate M.T. in person, nor did he contradict any of the assessment reports and testimony by medical professionals admitted into evidence on behalf of M.T. APD's witness testified that the IQ test offered by M.T.'s

---

[4] "Intellectual disability" has since replaced "mental retardation" in federal and Florida statutory provisions as well as the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.

[5] The doctor, a Clinical Associate Professor in the Department of Neurology at the University of Miami Miller School of Medicine, reported that the earlier Miami-Dade Schools IQ test was "a more accurate indicator of [M.T.'s] level of functioning" because the later assessment was conducted using only four of the eleven tests administered by the Schools. The doctor concluded that M.T. "is performing within the Mentally Deficient range of overall intelligence and additionally presents multiple neuropsychological impairments in measures of language, learning and memory, and processing speed among others that are disabling and warrant comprehensive services and interventions to maximize his functioning and independence in his activities of daily living."

current neurologist "was conducted after the developmental years, that is, after age 18, as defined by statutes." He further testified that the test "can be accepted," and that "the main thing is that prior to the age of 18 we don't have any document that substantiates the presence of an intellectual disability."

The hearing officer, apparently accepting APD's legal argument that the statutory definition of "intellectual disability," together with the pertinent administrative rules promulgated by APD, require an applicant to provide a qualifying IQ test score administered prior to the applicant's eighteenth birthday, continued the hearing to permit M.T.'s mother to obtain and provide that evidence. At that hearing, M.T.'s mother offered additional evidence, including the report from M.T.'s physician in the Division of Neurology at the Children's Hospital in Philadelphia that "M.T. is now a 14-year-old with chronic static encephalopathy of unknown etiology resulting in mental retardation and intractable generalized epilepsy." (Emphasis provided).

In response, APD reiterated its legal position that the statutory eligibility criteria includes a qualifying "full scale IQ score before the age of 18." The hearing officer affirmed APD's determination of ineligibility in the final order based on the following interpretation of section 393.063(21) and Florida Administrative Rule 65G-4.014: "Specifically, there is no record of a full-scale IQ score below 70 prior to age eighteen (18) as required by the regulations."

6

APD and the hearing officer reached this conclusion based on the provisions of Rule 65G-4.014:

(3) Mental Retardation or Intellectual Disability -- is evidenced by the concurrent existence of:

(a) Significantly subaverage general intellectual functioning evidenced by an Intelligence Quotient (IQ) two or more standard deviations below the mean on an individually administered standardized intelligence test, and

(b) Significant deficits in adaptive functioning in one or more of the following areas:

1. Communication skills,
2. Self-care, home living,
3. Social and interpersonal skills,
4. Use of community resources and self-direction,
5. Functional academic skills,
6. Work, leisure, health and safety awareness and skills,

(c) Which are manifested prior to age 18; and

(d) Constitute a substantial handicap which is reasonably expected to continue indefinitely.

M.T. provided an individually administered standardized test reflecting a full-scale IQ of 61, which APD concedes is two or more standard deviations below the mean. APD does not dispute that M.T. also established the requisite "deficits in adaptive functioning" specified in the statute and rule, and the existence of those deficits both before and after M.T. turned 18.

Instead, APD relies exclusively on the fact that the IQ test was administered when M.T. was 21 years of age, rather than when he was age 18 or younger. In

taking that position, however, APD has ignored (and the hearing officer did not address) M.T.'s written diagnosis of "mental retardation" by Dr. Berqvist, an M.D. neurologist at the Children's Hospital of Philadelphia, when M.T. was fourteen years old. Reports by Dr. Berqvist dated June 3 and July 10, 2007, were introduced and admitted to the record in this case without objection. M.T. was born in June, 1993. Each report states that in addition to "intractable mixed epilepsy," M.T. was determined to be mentally retarded.[6] That diagnosis was established, and thus "manifested," before M.T. was 18. In its definition of intellectual disability, the Legislature did not impose a requirement that an applicant for the HCBS Waiver Program provide an IQ test administered before the applicant turned 18.

Based on that dispositive legal issue, we reverse the decision below and remand with directions to APD to grant M.T.'s application for benefits under the HCBS Waiver Program.[7]

---

[6] In 2007, "intellectual disability" had not yet been substituted for "retardation" and "mentally retarded" by many practitioners and in the diagnostic literature. For example, the federal government did not make the change until 2010, when "Rosa's Law" was enacted, and Florida did not make the substitution in Chapter 393.063 until the enactment of Chapter 2013-162, Laws of Florida, effective July 1, 2013. The American Association on Intellectual and Developmental Disabilities specifies that "every individual who is or was eligible for a diagnosis of mental retardation is eligible for a diagnosis of intellectual disability." https://aaidd.org/intellectual-disability/definition/faqs-on-intellectual-disability#.V6INWGT6vuh (site last visited Aug. 3, 2016).

[7] We need not, and therefore do not, address M.T.'s additional argument that

Reversed and remanded with instructions.

_____

APD's interpretation of the pertinent statute is unconstitutional. "When a case may be resolved on grounds other than constitutional grounds, the Court will ordinarily refrain from proceeding to decide the constitutional question." <u>The Fla. Bar v. Gold</u>, 937 So. 2d 652, 655 (Fla. 2006).